**VERSAGGI SHRIMP CORP., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 651–87 C.**

United States Court of Federal Claims.

March 22, 1993.

Ann R. Steinberg, Chevy Chase, MD, attorney of record, for plaintiff.

Anthony H. Anikeeff, with whom were Director David M. Cohen, Asst. Atty. Gen. Stuart M. Gerson, Cynthia Schnedar, Dept. of Justice, Washington, D.C. Dave Balton, Dept. of State, Washington, DC, for defendant.

## OPINION

WIESE, Judge.

When first presented here, this case involved a claim by plaintiff for additional compensation in redress of losses allegedly covered by guaranty agreements issued under the Fishermen's Protective Act of 1967, *as amended,* 22 U.S.C. §§ 1971–1980 (1988 & Supp. III 1991). During the briefing of this issue, evidence was uncovered that cast doubt upon the integrity of plaintiff's claims—not only as to those elements which had been paid, but also the contested portions that were before this court for resolution.

To address this concern, the Government moved for a stay of proceedings and an order remanding the matter to the agency involved for reconsideration in light of the newly discovered evidence. The motion was granted. A readjudication of plain-

tiff's claims followed, and out of this emerged a revised administrative decision voiding the loss guaranty agreements because of fraud and demanding the return of all amounts previously paid to plaintiff.

It is in this altered form that we take up the case once again. This time around, however, it is the Government's demands for compensation that define the issues for decision. Before us now on defendant's motion for summary judgment and plaintiff's opposition are counterclaims seeking, alternatively, (i) enforcement of the agency's decision on reconsideration (*i.e.*, recoupment of all sums previously paid to plaintiff under the loss guaranty agreements together with interest on these amounts), or (ii) treble damages and statutory penalties under the civil False Claims Act, 31 U.S.C. §§ 3729–3733 (1988 & Supp. III 1991). To this latter counterclaim there is joined a demand for repayment of certain amounts which were identified by the Government, upon recomputation, as having been erroneously paid in the first instance.

In addition to these counterclaims, the Government also asserts a special plea in fraud asking for forfeiture of the claims for supplemental compensation presented in the complaint. And, as a last matter, there is a claim for reimbursement of the costs that were incurred by the Government in the investigation of Versaggi's fraud.

The case was argued to the court on February 25, 1993. At the conclusion of the argument, the court indicated its intention to issue an opinion in defendant's favor. We now conclude that avoidance of the loss guaranty agreements was a proper exercise of contractual authority and that, in consequence of that action, the Government is entitled to recover, with interest, the monies previously paid to plaintiff. We further hold that the Government is entitled to reimbursement of its investigative costs (excluding, however, attorneys' fees and expenses).

### FACTS

Plaintiff owned three shrimp trawlers, the Cape Orange, the Condor, and the Sea Horse, that were seized by the Republic of Brazil in separate incidents in early 1984, each while engaged in commercial fishing activities in that country's territorial waters. The vessels, which were later confiscated, were subject to guaranty agreements authorized by section 7 of the Fishermen's Protective Act of 1967, *as amended*, 22 U.S.C. § 1977. These agreements promised compensation to a vessel owner for losses incurred in the event of a seizure and detention by a foreign nation asserting restrictions on commercial fishing activities in its territorial waters more onerous than those imposed on foreign vessels operating in the territorial waters of the United States. Specifically, the guaranty agreements obligated the United States to reimburse a vessel owner for (1) the actual cost of the lost vessel and gear; (2) the market value of the lost "catch"; and (3) fifty percent of the gross income lost as a result of the seizure.

In accordance with the guaranty agreements, plaintiff submitted separate claims for reimbursement to the Government. The claim for the Cape Orange, (submitted in August of 1984) was in the amount of $666,946.68; the claims for the Condor and the Sea Horse (submitted in May of 1985) were in the respective amounts of $843,431.28 and $866,453.07. After evaluation by the Department of Commerce (the agency then administering the guaranty program), the claims were certified as covered by the terms of the guaranty agreements and payments in satisfaction of them were initiated.

The payments did not, however, cover the entirety of the amounts originally sought. That fact, together with what plaintiff saw as an unreasonable delay in the commencement of payments in the first instance, led to the filing of supplemental claims in May of 1986 seeking an additional $1.3 million. These supplemental claims were rejected by the agency; thereafter, this suit was brought.

In the course of preparing its case here, the Government discovered evidence suggesting that Versaggi had altered delivery receipts (receipts recording the daily catch)

of all of its confiscated vessels, thereby inflating its claims for reimbursement of lost income. As already noted, this information prompted the Government to seek a suspension of proceedings here and an order remanding the claims to the Department of State.[1]

The suspicions about the validity of plaintiff's claims prompted an investigation that eventually resulted in a 15–count criminal indictment charging plaintiff and its president, Salvatore J. Versaggi, with mail and wire fraud, submission of false claims, and submission of falsified documents with respect to its claims under the Fishermen's Protective Act. The trial that was held on these charges resulted in a hung jury. However, on the eve of retrial, the Versaggi Corporation and Salvatore Versaggi each pleaded guilty to, and subsequently were convicted of, two counts of violating the criminal False Claims Act, 18 U.S.C. § 287 (1988).

By virtue of their guilty pleas, the criminal defendants admitted to the preparation and submission of false claims to the United States in connection with losses rising out of the seizure and confiscation of the Cape Orange, the Condor, and the Sea Horse.[2]

Upon conclusion of the criminal proceedings, the readjudication of plaintiff's claims was resumed by the Department of State. From that readjudication issued the decision we now have before us. This decision, which was filed here on November 15, 1990, reads in part as follows:

In view of the substantial evidence of misrepresentation in connection with these three claims, as well as a long-standing and consistent pattern of fraud by claimant with previous claims, the Department has decided to exercise its discretion [as permitted by Article III of the agreements] to void the Guaranty Agreements covering the three vessels in question, deny the claims pending before the Claims Court, and demand that Versaggi refund sums paid to it pursuant to the Guaranty Agreements together with interest.

In consonance with the determination to void the guaranty agreements, the agency demanded from Versaggi the repayment of $1,755,702.48 (the full amount Versaggi had been paid on its claims) plus interest on that amount measured from the time of payment (then estimated to be $838,515.27 for the period ending December 31, 1990).

Versaggi has not honored the Government's repayment demand. Instead, it attacks that demand here contending, first of all, that the guaranty agreements were improperly cancelled and that the resulting repayment demand is therefore contractually defective. Versaggi goes on to argue that, even if the cancellations are sustainable, the amount sought by the Government is grossly disproportionate to the actual amount of the fraud. Thus Versaggi, while conceding on the one hand that the fraud defeats its right to any affirmative recovery,[3] argues on the other hand that the fraud also defines the limits of the Government's repayment rights. Recovery beyond the amount of the fraud, contends Versaggi, represents a constitutionally impermissible second punishment.

The Government, for its part, maintains that the repayment demand does not in-

1. Responsibility for determining the amount of compensation to be paid on claims brought under the Fisherman's Protective Act was transferred from the Department of Commerce to the Department of State by Section 408 of Public Law No. 99–659, effective October 1, 1986.

2. The recital of "Stipulated Facts" included in the plea agreements identifies the amount of the fraud as "approximately $250,000 [that] was overpaid by the Government." In the sentence that was imposed by the district court on May 3, 1990, it was ordered that "as a special condition of probation" this amount be repaid to the United States by the Versaggi Corporation. *United States v. Versaggi Shrimp Corp.*, No. 89–211–Cr–T–13(08) (M.D.Fla. May 3, 1990) (Order of Judgment). However, as of the date of argument in the instant case, the $250,000 amount had not been repaid.

3. Versaggi concedes that under 28 U.S.C. § 2514 (1988) and the case law interpreting this statute, it would not be entitled to continue suit here on any claims affected by a prior fraud. *See e.g., Little v. United States*, 138 Ct.Cl. 773, 778, 152 F.Supp. 84, 87–88 (1957); *Kamen Soap Prods. Co. v. United States*, 129 Ct.Cl. 619, 641, 124 F.Supp. 608, 620 (1954).

volve a prohibited second punishment. Rather, the Government contends that the repayment demand and the decision incorporating it reflect a legitimate exercise of administrative authority which, to the extent reviewable here, must be upheld as a correct interpretation of the language of the loss guaranty agreements. As earlier indicated, the Government also presents other arguments as alternatives to its contract demand. However, since we find the case disposable in full on the basis presented in the administrative decision, we deem it unnecessary to now say more about those other arguments.

## DISCUSSION

 The question we start with is whether the contract clause which the agency invoked to cancel the guaranty agreements supports that action.[4] The clause in question, Article III, reads as follows:

ARTICLE III. *MISREPRESENTATION, CONCEALMENT, AND FRAUD.* Any misrepresentation, concealment, or fraud, including, but not limited to, any of the same respecting any claim of loss or damage, or any of the particulars thereof, under this Agreement, deemed by the Secretary, in his discretion, to be material, shall void this Agreement.

In determining the meaning of these words, we accord them their usual and everyday signification unless, of course, a different intention has been shown. However, no facts have been offered nor has any argument been made to suggest that the quoted words do not mean precisely what they say: "[a]ny ... fraud ... respecting any claim of loss or damage ... deemed by the Secretary ... to be materi-

al, shall void this Agreement." Considering the magnitude of the fraud that was attempted here—$256,307.89 is the precise amount—it surely cannot be questioned that there was a "material" violation of the guaranty agreements. Similarly, then, there can be no doubt that cancellation of those agreements pursuant to Article III represented a proper exercise of a contractually-sanctioned contract remedy. Decisions upholding the cancellation, for fraud, of private insurance contracts would affirm this conclusion. *See Claflin v. Commonwealth Ins. Co.,* 110 U.S. 81, 95–97, 3 S.Ct. 507, 515–16, 28 L.Ed. 76 (1884); *Fine v. Bellefonte Underwriters Ins. Co.,* 725 F.2d 179, 181–84 (2d Cir.), *cert. denied,* 469 U.S. 874, 105 S.Ct. 233, 83 L.Ed.2d 162 (1984); *Lykos v. American Home Ins. Co.,* 609 F.2d 314, 316 (7th Cir.1979), *cert. denied,* 444 U.S. 1079, 100 S.Ct. 1030, 62 L.Ed.2d 762 (1980).

Versaggi attempts to avoid this result by arguing that it is only where fraud infects a contract from the outset that the Government may avoid an agreement in its entirety. But a fraud occurring during performance, Versaggi maintains, does not give rise to a right of contract cancellation.

The argument is meritless. Not only is Versaggi's contention insupportable in light of the plain language of Article III, it is also insupportable as a matter of basic contract law. A fraudulent representation made during the bargaining process and a fraudulent representation incorporated into a contract claim are each transgressions of the contract process that give rise to a power of avoidance in the injured party. Restatement (Second) of Contracts §§ 164, 373, 376 (1979). In both situations, concern

---

**4.** Among the arguments initially raised by the Government was the contention that the administrative decision at issue was sheltered from judicial review by the language in 22 U.S.C. § 1977(d) declaring that "[a]ll determinations made under this section shall be final." Defendant contended that, under this language, determinations by the Secretary respecting claims for compensation under the Fishermen's Protective Act were not open to review in this court, or, if in fact reviewable here, then only under a highly deferential standard.

This argument, while it has not been abandoned by defendant, would appear to have little relevance to the issues now before the court. Our concern at this time focuses on questions of law rather than questions of fact. And even under a statute declaring agency decisions to be "final and conclusive and ... not subject to review," questions of law, at the least, would still remain open. *Lindahl v. Office of Personnel Management,* 470 U.S. 768, 773, 791, 105 S.Ct. 1620, 1624, 1633, 84 L.Ed.2d 674 (1985). We do not read defendant's present brief as saying otherwise.

for the integrity of a promise demands relief from the reliance falsely induced. Moreover, where public contracts are concerned the rule gains added force: contract payments tainted with fraud must be recovered because they involve an illegal disbursement of funds. *K & R Eng'g Co. v. United States*, 222 Ct.Cl. 340, 354–56, 616 F.2d 469, 476–77 (1980); *Fansteel Metallurgical Corp. v. United States*, 145 Ct.Cl. 496, 500, 172 F.Supp. 268, 270 (1959).

■ Moving on to plaintiff's other argument, the contention is that cancellation of the guaranty agreements, even if permissible, would not entitle the Government to recover more than the amount of the fraudulent overpayment. Any recovery beyond the actual amount of the fraud, argues plaintiff, becomes a second punishment and, as such, is prohibited by the Double Jeopardy Clause.

In support of this point, plaintiff refers to the decision in *United States v. Halper*, 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989)—a case involving Government efforts to collect penalties under the civil False Claims Act, 31 U.S.C. §§ 3729–3733, in redress of injuries for which *Halper* earlier had been criminally tried and convicted. The Court ruled in *Halper* that such efforts by the Government run afoul of the constitutional prohibition against multiple punishments for the same offense where the civil penalties demanded bear no rational relation to compensating the Government for the harm it has suffered. 490 U.S. at 449, 109 S.Ct. at 1902.

The *Halper* decision does not apply to the problem before us. The repayment which the Government seeks in this court is not a "sanction[ ] imposed on the individual by the machinery of the state." *Halper*, 490 U.S. at 447, 109 S.Ct. at 1901. It is, instead, a demand that flows out of a consensual undertaking and from the remedies appropriate to its breach. The return to the status quo which the voiding of the

guaranty agreements necessarily implies, also dictates that the Government be restored to the position it was in before the agreements were executed. Repayment of all sums received by Versaggi, together with interest measured from the date of the agency's demand (November 7, 1990) is the appropriate restitutionary measure.[5] Restatement (Second) of Contracts § 376 (1979).

■ The last matter we consider is the Government's demand for recovery of approximately $90,000, identified as the costs incurred in the investigation of plaintiff's fraud. Such costs, the Government maintains, are recoverable as part of the amount awardable pursuant to a non-statutory civil remedy. Cited in favor of this contention is the decision in *Continental Management Inc. v. United States*, 208 Ct.Cl. 501, 527 F.2d 613 (1975).

The question presented in *Continental* was whether, despite the absence of proof of specific monetary injury, the Government could recover on a counterclaim seeking damages equal to the sum of the bribes paid to federal employees by the president of plaintiff's predecessor corporation. Starting with the common law rule that a principal may recover damages from a third party who has knowingly induced an agent's breach of duty, the court went on to hold that proof of the bribes was enough, in itself, to sustain the Government's demand. Further specificity was not required.

In reaching this conclusion, the court pointed out that common experience taught that subversion of public officials was never without harm to the Government. Among the injuries which the court identified with plaintiff's bribery were "the administrative costs of firing and replacing the venal employees and the costs of investigation," all of which, the court declared, "are compensable in fraud cases." 208 Ct. Cl. at 510, 527 F.2d at 618. It is on the

---

5. The allowance of interest follows "from the longstanding rule that parties owing debts to the Federal Government must pay prejudgment interest where the underlying claim is a contractual obligation to pay money." *West Virginia v.*

*United States*, 479 U.S. 305, 310, 107 S.Ct. 702, 706, 93 L.Ed.2d 639 (1987) (citing *Royal Indemnity Co. v. United States*, 313 U.S. 289, 295–97, 61 S.Ct. 995, 997–98, 85 L.Ed. 1361 (1941)).

basis of the quoted language that the Government contends that it may recover here the costs incurred in ferreting out Versaggi's fraud.

We agree with the Government's position. Although the *Continental* decision is not on all fours with the instant case, it is certainly solid authority for the rule which the Government draws from it: that damages associated with the vindication of a common law right may include the costs of a related fraud investigation. We therefore hold such costs to be allowable here, not as contract damages, but, rather, as a restoration of those sums necessary to return the Government to the position it held before the guaranty agreements were executed.

One qualification is necessary, however. Some of the costs being claimed appear to involve attorneys' fees rather than investigative costs.[6] These fees may not be recovered.

The general rule is that "absent statute or enforceable contract, litigants pay their own attorneys' fees." *Alyeska Pipeline Co. v. Wilderness Society*, 421 U.S. 240, 257, 95 S.Ct. 1612, 1621, 44 L.Ed.2d 141 (1975). Granted, there are exceptions to this rule, but none has been shown to be applicable here. Accordingly, the amount allowable to the Government for investigative costs must be reduced. After exclusion of attorneys' fees, the amount remaining comes to $42,189.41. That is the amount we award for investigative costs.

## CONCLUSION

For the reasons stated in this opinion, defendant's motion for summary judgment is granted in the following respects:

*One,* pursuant to Article III of the guaranty agreements, defendant is entitled to repayment from plaintiff of $1,755,702.48, together with interest on that amount, at the rate prescribed by law, extending from November 7, 1990 until the date finally paid.

*Two,* pursuant to its common law right, defendant is entitled to reimbursement of investigative costs of $42,189.41, together with interest on that amount, at the rate prescribed by law, extending from the date of judgment until the date finally paid.

*Three,* pursuant to 28 U.S.C. § 2514, defendant is entitled to forfeiture of the claims presented in the complaint.

The Clerk is directed to enter judgment in defendant's favor in accordance with the foregoing and to dismiss the complaint with costs.[7]

---

6. The declarations accompanying defendant's reply brief identify the investigative costs as salaries paid to various Government employees during the period of their involvement in the fraud investigation and the related "field" expenses incurred by these employees. The breakdown, by agency, is as follows:

United States Department of State, Office of Inspector General—$32,154.09.

United States Department of State, Bureau of Oceans, International Environmental and Scientific Affairs—$10,035.32.

United States Department of Justice, Civil Division—$46,522.97.

7. As previously pointed out in this opinion (note 2), a condition to the probation granted Versaggi by the district court, was payment of $250,000 to the United States. However, because this amount has not yet been paid, it cannot be treated as an offset against the amount determined to be due the United States pursuant to the judgment we enter here. *See Teachers Ins. & Annuity Ass'n v. Green*, 636 F.Supp. 415, 418 (S.D.N.Y.1986).